Judge Pregersen stated in the Wellman case, in Hollywood, a screenwriter's name is his most coveted asset. But unlike Wendell Wellman, Appellant Eddie wasn't just one writer out of many on the film The Last Samurai. He was the very first writer. And as the first writer of an original screenplay, Mr. Eddie would have been guaranteed, at a minimum, shared story by credit, if he had been listed as a participating writer. But Mr. Eddie didn't receive this guaranteed credit because Warner Brothers didn't list him as a participating writer. So Mr. Eddie went to his union to file a grievance. The union conducted an investigation, and it's in this investigation that we contend that the union breached its duty of fair representation. We've argued that, first of all, it did not follow the minimum basic agreement, and second of all, it did not follow its own internal policies. The end result is the guild did not challenge Warner Brothers participating writer list. They made a pretty thorough investigation, and they had pretty thorough procedures for reaching the determination that they reached. As I understand your argument, and maybe you can tell me what else I'm missing, there were two basic points, as I understood what you were saying. One, you believe that if there was a majority vote that he was at the creative test, that that required them to go forward because they were bound by a two-to-one vote. You believe, A, it should have been treated as a two-to-one vote in your favor instead of a two-to-one vote against you. B, that if there was a two-to-one vote, that was the end of the issue, that the guild didn't have the discretion to review that and make its determination, considering that as well as a number of other factors. And that finally, that they demonstrated either bias or violated the rules by misinforming one of the arbitrators about what the result of the business continuity examination had been. Are those factors the basis on which you say the union failed to perform in an arbitrary or discriminatory manner? It's those factors. And in addition to that, we've also argued that once the union decided that there was business continuity, that ended the discussion under Schedule 8, Paragraph 9. So where do you find in the union's procedures a requirement that they stop with business continuity and not consider any other factors? Well, the argument is that in the MBA, Paragraph 9 of Schedule 8, it says that if a screenwriter is employed on the story or screenplay, then he or she should be a participant. So our argument is that Mr. Eddy was in the chain of writers on the story, and therefore he should have been considered a participant. They shouldn't have had to go into the creative analysis. But even assuming that they decided to do that, then you go to the internal policies, which we argue they failed to follow. Is that clear? Yes. And as far as the creative policies, you think that they specify that the votes of the three readers are final and bonding? If you look at the excerpt of record, page 420, it's Section 5B. It's the one at issue, and it says that initially one reader is used for the same project determination. If there is a question raised with a decision, two additional readers may be used with the majority decision being controlling. Yeah, it controls that question of the creative factor. Correct. And then it says, you know, after they do the various things, they go to whatever her name is, the head of the department that decides these things. Kathy Reed. Kathy Reed? Yeah. And don't they go to her with a number of factors which she considers? You think business continuity is enough by itself, but that's one factor. Creativity is another factor. And the very first factor is whether it was a guild-covered project, which as to the first two factors, they were in Eddie's favor. And they go to the department, which then makes the decision. Right. The decision is based on the three factors. The third factor we're contending was a vote in Eddie's favor that was actually flipped by Sally Burmeister. Okay. And maybe where you're going with this is that there is a general policy that the appellees raised in their briefs that it allows, it says that if you have any questions, you can go to Kathy Reed with any problems. But our argument is that if the policy says majority decision controls, then that means it controls. Well, the question is what it controls. Does it control the determination as to the creative factor? Or does it control the outcome of whether this is a case to proceed with? Well, I think under either scenario it doesn't matter because they already found that the first two factors, that it was a guild-covered project and business continuity was in Eddie's favor. The third factor in Eddie's favor would have satisfied the first three. Either way, it doesn't matter. Well, suppose they made a mistake. You know, they believed that the vote was 2-1 in their favor, that there was no creative factor. There was a dispute because the individual who was evaluating it said, well, I'd say there's no creative factor, but if the business factor's there, then that would change my view. Right. And then he was told, you're not to consider the business factor. You're just to look at the creative factor. So you're supposed to delete that part. All right. Now, you think that that was wrong and they gave them the wrong information about the business factor and that the vote should have been counted your way. The union believed that they were right in telling them to delete the paragraph and that the vote should go the other way. So there's a disagreement about what the 2-1 vote is. Now, that kind of disagreement, why is that kind of a disagreement sufficient to say that the union was arbitrary or discriminatory rather than simply wrong? Well, the problem is that Kathy Reed wrote a letter to Garner Simmons after the investigation concluded, and she said that the reason why you lost is because the majority voted against you. It wasn't. Well, they believed that the majority voted against them. Now, as I said, they may be wrong in that determination. Why, if they are wrong and the vote really was 2-1 the other way, why does that meet the test for breach of the duty of fair representation as opposed to being simple error after actually not treating this in a perfunctory way, not having a hostility toward the individual, but simply making an error as to what the vote was? Well, because it wasn't actually an error. It would satisfy the bad faith test, because in that test, if a union acts dishonestly, then it would satisfy the test. And our contention is that when Sally Burmeister told Richard Kletter, she didn't say don't consider business continuity. She said there wasn't business continuity, which changed his vote. And that's not true, because the guild had already found that there was business continuity. So even if the guild exercised discretion. But that was irrelevant, wasn't it? The point was that he was not to consider the business continuity. He was only to consider the creative issue. Well, that's not exactly true, because the cover letter that was sent to Mr. Kletter says that he's allowed to consider creative issues as well as any other relevant factors. And to him, he considered that to be a relevant factor, whether Mr. Eddy was the first in the line of readers. That's ER 450 and 451. Okay. Okay. So, you know, as Your Honor has pointed out, we've got sort of a multi-tiered approach. First, it's under the arbitrary standard. We contend that they didn't follow their policy. But even if we have to go to the bad faith standard, the dishonesty in telling Richard Kletter that there was no business continuity, when, in fact, there was, would cause a breach of duty. Going back to the arbitrary standard and whether the decision not to follow the policy would be considered ministerial or not, the arguments are in the briefs that there's plenty of cases that support that a union's failure to follow its own policy is a ministerial act. Therefore, it's viewed under the arbitrary standard. This wasn't a first-of-a-kind situation where the Guild was faced with, I don't know what to do. We've never been in this position before. There were four arbitration decisions that the Guild relied on. There was a written policy. They were very familiar with how this was to take place. And, in fact, as Kathy Reed's letter after the investigation states, she followed that policy and relied on the majority decision to deny Mr. Reddy's grievance. The problem with the Guild's position is that they changed their position on appeal and tried to claim that she didn't really count the votes. She just considered what the experts said. Obviously, the reason why they're doing that is to invoke some sort of judgment involved in the process. But, again, what Kathy Reed said after the investigation is more telling than what she said in the declaration for summary judgment. And the Court never even considered the arbitrary standard. The district court didn't even consider that. It went straight to the bad-faith standard. And we believe there are facts which fit under both. This case is also similar to the ---- It's fairly hard to understand why it would be ministerial if it's ---- if they had to consider four arbitrations, they had to determine what the policies were, how the union applies this procedure. I mean, it's ---- there wasn't just something automatically applied. The policy seems fairly complicated. And the process, I mean, it's a ---- they didn't ---- why is it that you think this is just a simple ministerial act determining whether to go forward with the arbitration? Well, if you look at Ms. Reed's declaration that was submitted with the summary judgment, she never claimed that this was so complicated that she didn't know what she was supposed to do. She said ---- No, no, in order to have discretion doesn't mean that there's a ---- or to be non-ministerial doesn't have to be all that complicated. But, I mean, ministerial means you just look at something, it's automatic, it's clear. And this whole process, if you look at it, is a judgmental process. Whether it's Ms. Reed's, the readers, the people who look at the business thing, is it ---- the union went through an entire process that is a ---- involves a lot of discretion. We don't believe it involves any discretion because the process is already in place as to what they're supposed to do. They already determined that there was business continuity. Then when you get to the creative ---- That's part of the process. All of this is the union's investigation. They had a thorough, complicated investigation in which they may have made some mistakes. And maybe they acted in bad faith. If they acted in bad faith, that would be enough. But if the test of whether ---- I mean, the issue we're talking about is whether it's just bad faith or whether arbitrariness is enough. That's right. And if it's discretionary, then it has to be bad faith. If it's ministerial, then you can have arbitrary. And when you look at the union's process, isn't it ---- isn't there a lot of discretion involved in what the union had to judge, the determination it had to make? Not when the policy says send it to a reader and their decision controls. She did not have to look at what the expert reader even said. She had to look at the conclusion. And she was just to tally them up. And she said, that's all I did, I just tallied them up. It was only in summary judgment where she came back and said, well, you know, there was a lot of factors involved, and I considered the pros and cons of whether Eddie would ultimately win. Another important thing is that in all of these duty of fair representation cases is you have to consider the merits of the grievance and the impact to the person who, in this case Eddie, who could end up losing. Eddie would have received shared screenplay credit had he been a participating writer. There's no doubt about it. Nobody disputes it. So Reed could have considered that and said, well, look, I should really make sure I follow the policy in this case, give him the shot. As the district court said, you know, he should have a ticket to the credit derby. Those considerations weren't made in this case. It was simply Reed said, well, yeah, there was the first vote that we actually flipped, but I'm going to count that against Eddie. There was one for him, which favors Eddie, and there was one against him. You have to consider the importance to the individual. And I think if you maybe going back to your question, the Banks v. Bethlehem case says that the duty of fair representation requires that before assessing the merits of a grievance, the union must have an adequate basis upon which to make an assessment. And our point is that, yes, the ultimate made a decision, but that doesn't mean that only the bad faith standard applies. You have to look at what took place in that decision-making process. And in our situation, there was a failure to follow the policies, and there was the lie that was told to the initial reader who was told that he could consider any other relevant factors in his decision-making. If there are any other questions, I'll take them. Otherwise, I'd like to reserve the balance of my time. Thank you. Good morning. May it please the Court, Anthony Siegel for Writers Guild West. Yes, Judge Reinhardt, it was all about judgment, and we shouldn't lose the context in which the Guild's decision took place. The context under the contract was very specific, and it's not in dispute here. The Guild was doing this investigation to determine whether or not to file a grievance to bring the first four writers on the earlier project in as participating writers. It's undisputed as a matter of contract interpretation that we didn't have the unilateral authority to designate who the participating writers were. We arbitrated that case in the Days of Thunder case in 1990, and in fact in that arbitration we took the position that we did, that that was a matter within our sole determination, and the arbitrator ruled against us. Since 1990, that has been a binding interpretation of our collective bargaining agreement. So this is not a case about vote counting. We are not functionaries who are simply tallying up the votes of readers. We conducted a very thorough and very painstaking five-month investigation that had many facets. It involved talking to all of the writers on both projects. It involved the primary efforts of three very senior executives at the Guild. I tallied it up. Among them, they had close to 60 years of experience in operating this credit determination process. Where do you find the actual procedures that determine how you are supposed to make the determination as to whether to proceed to arbitration? Are they in the internal memos, or is there a one document that says here is what we do, we're bound by the vote, or we're not bound by the vote, or? What happened here is what happens frequently under collective bargaining agreements. There was a flurry of arbitration decisions about this issue. The first case was Days of Thunder, and that's the case that really said that the question of who's a participating writer, unlike everything else that goes on during the credit determination proper, this preliminary step of determining who the universe of participating writers is, is something that has to be arbitrated. And if the company and the union disagree about it, they have to arbitrate it. You have to determine whether you're going to take the case to arbitration. Right. And in order to do that, you follow certain procedures. Right. And that analysis, if I may, is informed by the four arbitration decisions that came like clockwork in 1990, 91, 92, and 93. But where would you look? If you wanted to know, you were a writer, and you want to know what's the procedure going to be, how are they – how's the union going to decide whether to process my case? Where would the writer find that out? There is not – it's not in the contract in any very helpful form. The contract just says it's kind of tautological, people who participated in writing the screenplay. I know. Normally a contract wouldn't tell you what the union's procedures are. Right. The union would have its procedures somewhere. Right. In bylaws, in rules, in some kind of description of how this works. The union's procedures – the union publishes something called the credits survival guide, and that's the sort of most user-friendly, member-directed explanation of how it works. And there's a section in there, and I admit it's not very detailed. There's a section in there that says we sometimes have to conduct participating writer investigations, and in those investigations we sometimes use expert readers. Now, in terms of things readily available to the membership at large, that's it. Now, internally what we've done over the years is in the wake of the four arbitration cases, we've developed more detailed and articulated internal procedures. Those are in the record. All right. Are those – that's what I was – is that where you find them? In this memorandum, for instance, from Murphy Reed? Correct. Correct. There are actually three different documents. These are internal documents. They start in the record at excerpt of record 418 and go on for six or seven pages after that. Those are for the internal use of the credits department, and I will say that they are by nature pretty general because there are a lot of different factual variations in participating writer cases, and one size doesn't fit all. You know, as we've said, one type of participating writer investigation involves, you know, whether a later movie is a remake. Sometimes there are cases like this where there was one project and then there was a long period of time, six years, and another project starts up about the same subject matter. So the procedures that we've developed, and, you know, and the internal version of them is in the record, have to be flexible, but they're all in the context of trying to help the credits department conduct investigations so that ultimately a decision can be made about whether to press claims through arbitration. That's the legal context in which the State's placed. Your comment says that there are basically two factors, the creative test and the business factor, and that it was here it was determined that the writing met the business, I don't remember exactly the phrase, but... Business continuity. Business continuity. That it met the business continuity and that if it met the creative test, that would then meet the only two factors that are relevant, and therefore you would be required to proceed to arbitration. Well, the answer to that is it's not nearly that mechanical. And, in fact, if you look, the most clearest statement of it in this case is the letter, and it's been talked about already, that Kathy Reed sent on October 15, 2003. At the end of this process, it was sent to Garner Simmons, who was another writer, but it was also copied to Mr. Eddy, the plaintiff, in this case. And there she really, she lays it out as three factors. The first factor wasn't in dispute, but sometimes is. The first factor is did the writers trying to get in work under the jurisdiction of the guild's contract? So we blew past that one. The second one is business continuity. And what she said about business continuity is that the factors here were mixed. And, in fact, if you look at the arbitration awards, they enumerate eight factors of business continuity. And I was looking at them this morning, and if you run through those, we had met in this case about four of eight. And what Kathy said was, well, we think there's enough business continuity here to warrant sending it to readers. There's enough where we could make a colorable argument about business continuity in arbitration. So we sent it to readers. Now, here's where we get to the allegations that we stuffed the ballot box, and we didn't. Before you get to that, that's a separate question. But I want to ask you, in the memorandum of January 31st, 1997, which sets forth the policy on expert readers, it says the decision of the expert reader and other pertinent factors shall be evaluated in the guild's determination of participating writer status. Now, does that mean that, and I assume that evaluations by that department that Kathy Reed heads, when you say the decisions of the expert reader and other pertinent factors, are the other pertinent factors those two other things you mentioned? Yes. And that's it, the three things? Yes. Okay. And now business continuity itself, as I say, encompasses... A lot of different things, and they don't always point in the same direction. Do you have any internal review process? What if the readers are just wrong about something? Internal review in a participating writer investigation? Yes. Well, we have this is an investigation. It's not an adjudication. We do have, as we did here, the option if we think there's any question about the decision of an expert reader, we go to two more expert readers, and that's what we did here. We gave Mr. Eddy and the three other writers the benefit of the doubt here. And if now I can go to the issue that somehow we exerted improper... No, no, no, not yet. No? Not there yet? I want to follow up with what Tompkins is asking. All right. So you have a determination by three readers, two to one, one way or the other, whatever it is, and you have a judgment on business continuity which may be mixed. Is there someone or some group that then makes a judgment based on those factors? Who is it that makes that judgment? Or is it then automatic once you receive the report? No, nothing is automatic when you're deciding whether or not you have sufficient evidence to pursue an arbitration. Suppose the three readers all say, no, it's not enough for artistic continuity or whatever it is to meet the creative continuity factor. They say it's not enough. Can Kathy Reed and that department say, well, looking at the business factors, looking at what they said despite their conclusion, we're going to override this and go ahead to arbitration anyway? Can she in what sense? There are legal constraints on her doing that. Her decision has to meet the duty of fair representation. Well, there's no violation. And I would tell you... Wait a minute. There's no violation of the duty of fair representation if she says go ahead and we're going to represent you. Oh, but, Your Honor, that's absolutely not true, and that's an important part of this case. Why is that a violation of the duty if she says we're going to represent you in the arbitration? Because we would have been exposed to liability to the first writer on the second project, in this case a man named John Logan, who thought that he was the first writer, who had never read the earlier scripts, whose contract didn't assign the earlier scripts to him. Credits are, at the end of the day, a zero-sum game. By asking to go to arbitration, that's violating the duty of fair representation? Well, I'm saying there is a legal constraint. Our decisions have to not be in bad faith. If we had... Then you're saying she is bound by what the three writers determined? No. I'm saying that she is bound to make a good-faith decision based on the entire investigation. Well, that was what I asked you. I said... I'm sorry if I've... All right, listen. I said if Kathy Reed has all of the information regarding the factors in the business determination, business continuity, as you say, they're not entirely clear. She has to report on those factors. She says, well, that may be enough to go ahead. She then gets mixed reports from the three readers, and even there, they may not be absolutely, each one 100% certain. But two of them say, well, we think there's enough, and one says, I don't think so. Can she make a judgment that's different from the two-to-one vote? Can she say, I'm looking at the business factors, I'm looking at what all three say, and my judgment is, in good faith, considering all these things, I do or don't think we should go to arbitration? She, as the department head, has discretion. She, in practice, consults with the general counsel because it's fundamentally a legal decision, as all unions do in much more traditional labor management context in deciding whether to take a case to arbitration. And I want to diffuse, put the lie to a red herring here, which is the idea that somehow Kathy Reed changed her story and said she was exercising judgment only once we got to court. If you look at the very end of the letter that she wrote to the writers on October 15, 2003, her conclusion says, quote, the guild determined that we did not have enough evidence to meet our burden of proof to establish an illegal proceeding under the MBA or otherwise, that the writers, the writers from the first project, were participating writers. Clearly, our position all along is that we are making a judgment about whether there is sufficient evidence to file an arbitration claim against Warner Brothers and go to hearing. Now, with your blessings, I would like finally to get to the point that I want to make about the readers' reports. The idea somehow that we flipped, it's the word that's been used here this morning, the vote of Mr. Kletter is simply and kind of definitively belied by the record. And all you have to do really to understand why we didn't take this case to arbitration is to read the reader reports. And, yes, Mr. Kletter was asked to take certain material that applied the wrong standard out of his initial report, and he issued his report appellate. Courts know something about adjudicators applying the wrong standard. But the essence of his opinion about substantial similarity remained the same from the first decision to the last decision. I'm reading now from excerpt of record 453. This is the very first decision before any of the alleged meddling took place. Mr. Kletter writes in introducing his analysis, yet these two sets of material could not be more different. He then goes through a detailed analysis of the factors, and he concludes, quote, the difference between these two sets of material overwhelm any superficial similarity of setting and character. So I can say with confidence that the writers of the yellow material, the first material, make no credit worthy substantive contribution to the blue material. Now, that's his first report. And that's why at that point we had grave misgivings about our ability to go into arbitration and under the standards of the days of thunder arbitration prevail. So we gave the writers the benefit of the doubt. We sent it to two more readers. And I think all you have to do is to read the conclusion of one of those readers, Mr. Frohman, who writes in his conclusion, quote, if the writers of the yellow material were to be granted some credit for the blue material, it would be akin to giving the first writer of a Civil War movie credit for all succeeding Civil War movies, or the first writer of a Western to be given credit for all succeeding Westerns. Now, these two guys were going to be our expert witnesses, our expert readers, in the arbitration if we had chosen to file it. At a minimum, it would have been discoverable that we had these reports and that we knew of their opinions. That's the substance, that's the real core of the reason why we made the very rational judgment not to proceed to arbitration. I think you've answered this implicitly, but just to be clear, in a hypothetical case, you hire two readers. One of them says, yes, there should be credit. The other one is disparaging in that regard. You can use the first reader, if you go to arbitration, to support your claim, but the opinions of that second reader are available to the movie studio, the production company, the opposite side. That would be discoverable, and they could call them as a witness. They would definitely be discoverable in that. You've answered my question, thank you. One other question. I think you said you wanted to comment on the statement that you interfered by telling one of the readers, giving them false information as to what the business continuity decision had been. Well, it's related to a question that I've already answered about whether we flip that. Our position was, and it's very clear from the letter that we send to the readers, and all three of them are in evidence, they're just form letters, that our position is we don't want the readers in this situation to consider business continuity. Does that mean you're saying it's irrelevant that you gave them false information? We didn't give them false information. I think the record evidence is somewhat muddled. Sally Burmester's testimony in deposition, and it's in the record, was that she told him not to consider it. It's a different position in somewhat different words, but ultimately our position is that we don't want them to consider it. And ultimately, Mr. Kletter didn't. The important part of his analysis is not about business continuity. Business continuity is complex, and the people who are our readers are not professionals. And Judge Hawkins just referred to hiring readers. We should say these are professional screenwriters who are volunteering their time. The whole premise of the credit determination process... Yeah, well, except these guys don't get paid. They're volunteering their time because they believe that ultimately it's in the best interest of all writers to have writers determining who gets credit. Thank you. Well, we've only got 49 seconds. Okay, Your Honor, then I'll be brief. May it please the Court, William Cole representing Warner Brothers Radar and Interscope. I wanted to just briefly, since it was not raised in the appellant's opening argument, discuss the other part of this case, which is dismissal of their claims, State law claims, of fraud and breach of contract against these three defendants. And I think I can sum it up very quickly for you. The contract that they contend was breach. Weren't these all dismissed because automatically or not on the merits? A 301 preemption. They were dismissed on a 12B6 under 301 preemption because these were basically, this was a settlement agreement the union had entered into. It's the union's position to either bring it or not. But the claim couldn't be decided without deciding whether or not these two, the Eastern Western Project and the Last Samurai were the same project, the same question that has to be decided under the collective bargaining agreement in connection with the participating rider dispute. And the court below found that basically those claims were so interrelated with interpretation of the collective bargaining agreement and the decision of whether or not these were the same project was one governed by the collective bargaining agreement and therefore they were preemptive. But that claim was, that position, I'm sorry, that dismissal was appealed and is briefed. And I just wanted to mention that and answer any questions you might have. Any questions? Thank you very much. I will give you a minute because you're 3 minutes and 13 seconds over time. I think it was 3 minutes under, but that's all right. No, it was not under. Was it under? What? Under? Overruled. Go ahead. All right. So just trying to hit the points. There's an issue of fact as to what was said to Richard Kletter. Sally Burmester says, I don't remember telling him that there weren't. And he says, absolutely. It's completely on the record. There's no question about it. It's cited on page 15 of our brief. My opponent explained the decisions of Kletter and Froman. And he said, in essence, there was no credit-worthy contributions to the script. Well, let's think about that. Credit-worthy contributions would matter in a credit arbitration. We're just trying to get to a legal arbitration to determine participating writer status. So it didn't matter whether Eddie made credit-worthy contributions, because as the first writer, he would have automatically received credit so long as he was a participating writer. There is no review process in the participating writer investigation. As Judge Reinhart is aware of from the Jacobs decision, the investigation is sort of haphazard. We sort of do what we want to do. There's no review. And that's why collateral estoppel wasn't applied in that case. I think it's also important to look at the arbitration decisions in the 29th Street case and the Winn case. In both of those decisions, creative continuity was not an issue. The only thing that was discussed was business continuity. And the conclusions of the arbitrators in those cases were, you're going to go to a participating writer arbitration. So, you know, the guild doesn't want to talk about those arbitrations. They want to talk about Days of Thunder because creative continuity was an issue there. But only one out of four arbitration decisions discussed creative continuity. There really was no explanation as to what majority decision controlling means. There was a little bit of a concession that, well, Kathy Reed sort of has some authority to overrule if it's a two-to-one decision, but there's really no rational explanation as to why or how that happens. The policy says majority decision controlling. That's what she did. That's what it means. And that's what's stated in her letter. It wasn't based on what the expert readers actually said in the reports. She just counted up the votes. And as we said before, the vote was flipped because of some false information that was told to one of the readers. And that's it, unless you have any other questions. Okay. Thank you very much. United States versus Rose. That's submitted.
judges: Pregerson, Reinhardt, Hawkins